

# Fourth Court of Appeals
## San Antonio, Texas

### DISSENTING OPINION

No. 04-22-00072-CV

**JMI CONTRACTORS**, LLC,
Appellant

v.

Jose Manuel **MEDELLIN**,
Appellee

From the 285th Judicial District Court, Bexar County, Texas
Trial Court No. 2018-CI-05983
Honorable Aaron Haas, Judge Presiding

Opinion by:     Luz Elena D. Chapa, Justice
Dissenting Opinion by: Rebeca C. Martinez, Chief Justice

Sitting:        Rebeca C. Martinez, Chief Justice
                Luz Elena D. Chapa, Justice
                Liza A. Rodriguez, Justice

Delivered and Filed: August 28, 2024

On original submission, we held that the trial court erred in sustaining Jose Manuel Medellin's objection to JMI Contractors, LLC's offer of evidence relating to Medellin's consumption of alcohol and marijuana before the incident. We also held that the trial court's error was harmful, and therefore, we remanded for a new trial. On Medellin's motion for rehearing, the majority assumes error, but it concludes that the error was harmless. Because the majority's harm analysis is flawed, and because we need not reach JMI's other issues, I respectfully dissent.

**I. EXCLUDED EVIDENCE**

Before trial, the trial court granted Medellin's motion in limine and prohibited, "[a]ny comment, question, statement or reference made directly about, or intended to elicit any testimony regarding the use of" either marijuana or alcohol by Medellin. At trial, JMI offered evidence of Medellin's consumption of alcohol and marijuana on the morning of the accident. Medellin objected on the grounds that such evidence was irrelevant and unfairly prejudicial. The trial court sustained Medellin's objections. Outside the jury's presence and in an offer of proof, JMI offered the pretrial deposition testimony of Medellin, Luis Garcia, Aberlardo "Lalo" Hernandez, Raul Rodriguez, and Jerome E. Spear, Medellin's expert on Occupational Safety and Health Administration (OSHA) safety regulations.

Medellin testified that, at 10:30 a.m. on the day of the incident, he had drunk one sixteen-ounce beer and smoked half a marijuana cigarette. Medellin stated that he drank and smoked because he believed that he was not going to be working that day. However, subsequently, Hernandez called Medellin and asked him to help at the Oaks Apartments. At the time, Medellin was at Sandoval Roofing waiting to receive his paycheck. Medellin agreed to assist Hernandez, but he did not inform Hernandez that he had consumed a beer and smoked marijuana. When asked "why did you go up onto the roof after drinking a beer," Medellin answered, "[b]ecause it was just one." The records from the hospital where Medellin received emergency medical treatment immediately following his accident indicated that he had a "baggy of some green leafy material" on his person.

Garcia testified that he and his wife went to Sandoval Roofing before the incident to drop off paperwork. There, at sometime between 10:30 a.m. and noon, Garcia witnessed Medellin holding a beer. Garcia admitted that he drank a beer on the way to Sandoval Roofing, and, at some unspecified time, smoked a marijuana joint. Garcia, however, denied smoking marijuana with

Medellin.  Thereafter, Garcia, his wife, and Medellin drove to the Oaks Apartments, arriving at approximately 1:30 p.m.

Raul Rodriguez testified that he saw Medellin arrive at the Oaks Apartments with Garcia and Garcia's wife.  Both Medellin and Garcia ascended to the roof and began working.  However, when Raul Rodriguez approached Garcia, he noticed that Garcia had been drinking.  Raul Rodriguez decided that it was not safe for Garcia to remain on the roof, and he "sent him down." Before Medellin fell, Raul Rodriguez did not suspect that Medellin was intoxicated or impaired because he was not stumbling, staggering, or slurring his speech.  Raul Rodriguez witnessed Medellin fall, recounting, "I turned around like this, and he was like this.  When he pulls the roll, because he was dizzy; he was drunk; his body tips off, and he falls down."  Raul Rodriguez descended from the roof, approached Medellin, and told him, "you should have told me that you were — you had been drinking."  As Medellin was laying on the ground, Raul Rodriguez noticed that he smelled of alcohol and marijuana.

Hernandez, on examination by JMI, testified:

Q.      Well, I learned for the first time in talking to Mr. Medellin . . . that he had drank a Tallboy beer and smoked half a joint before going up on the roof at the Oaks on Bandera Apartments.  Did you know that before he got up on the roof that morning?

A.      I was up on the roof when they got up there and I could smell him, you know; but that's regular.  I mean, that smell, it's already — it's old.  You know, it's old.

Q.      When you contacted Mr. Medellin that morning, you weren't — you didn't contact him about doing any work, did you?

A       No.  He called me and said that they didn't work.  [sic] I don't know if it was Sandoval or what company he was working for that day, but that they didn't work.  [sic] If I wanted any help.

. . .

Q.      So when Mr. Medellin contacts you, did you ask him whether he had consumed any alcohol or smoked any marijuana?

A.      I don't need to.  I don't need to ask him, you know.  I mean, because when you smoke, you smoke, you know.

Q.      So when he showed up at the Oaks on Bandera job site, did you have an opportunity to assess him before he got up on the roof?

A.      No, we were up there already.  So they went up there.  They got up there.

                                        . . .

Q.      Okay.  Now, going back to the day of the incident, when you went and observed Mr. Medellin, did other individuals go down there to the ground as well such as Raul?

A.      All of us.  All of — everybody got down.

Q.      And at that point, did you realize that Mr. Medellin smelled of alcohol and of marijuana?

A.      (Nodding head.)

        MEDELLIN'S COUNSEL: Object to form.

Q.      Is that when you first [sic] he had been drinking and smoking marijuana?

A.      No, no.

        MEDELLIN'S COUNSEL: Object to form.

A.      — since before.  Since he got there.

Q.      Oh, you knew when he got there?

A.      Yeah.  But if you've been drinking the night before, I mean, you're still going to f------ stink like alcohol the whole following day, sometimes two days.

Q.      And so did he smell of alcohol when —

A.      No.

On cross-examination by Medellin, and tendered by him as rebuttal evidence in the offer of proof, Hernandez denied seeing Medellin stumble or slur his speech. If Hernandez believed that Medellin was intoxicated, he would not have let him on the roof.

Spear testified by deposition:

Q.      Mr. Spear, if you're being honest and truthful in your testimony in this case, what are some of your opinions with respect to Mr. Medellin's responsibility for his actions and conduct on the day of the accident?

A.      Well, if — I would say, I mean, anyone has — has authority to — to refuse work at a — at an — you know, if the work site is unsafe, you know. So if — if he did understand — to the degree that he understood and appreciated the risks of the fall hazards from working without fall protection at an elevation above six feet then he should have refused the — to perform that work.

Q.      Okay. Anything else if you're being honest and truthful in your opinions with respect to Mr. Medellin's responsibility and duties on the date of the accident?

A.      Well, it's my — my understanding that — that he had drank a — a beer that — either that morning — I'm not exactly sure of the time frame or whatever else — and I believe he had smoked [a] joint or shared partially, and to the degree that — that he — that he felt that he was under the influence then he should have refused to perform that work.

## II. HARM ANALYSIS

Medellin made no argument regarding harm in his brief on original submission. On rehearing, Medellin argues that the excluded evidence of his consumption of alcohol and marijuana was cumulative. Specifically, Medellin contends that "medical records taken after the incident were introduced into evidence and contained results for blood alcohol and drug abuse screens, including several references to a positive marijuana result." As support, Medellin highlights four lines from approximately 635 pages of medical records from University Hospital that note: (1) "4.: +Urine tox: benzos, marijuana[;]" (2) "Pt w/ (+) marijuana UDS on arrival[;]"(3) "X ETOH

Alcohol (Ethanol only)[;]" and (4) "Consult (Inpatient) (Addiction Services-LCDC)[.]" This "cumulative evidence," according to Medellin, renders any error harmless.

Generally, we do not consider arguments made for the first time in a motion for rehearing. *See, e.g.*, *Torres v. Haynes*, 432 S.W.3d 370, 371 (Tex. App.—San Antonio 2014, no pet.) ("Points of error concerning the trial court's jurisdiction to proceed to judgment present questions of fundamental error and are exempt from the general rule that points of error raised for the first time in a motion for rehearing are too late to be considered."). We also are not required to search the record without direction from the parties. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *see, e.g.*, *Lambert v. Sw. Tex. Junior Coll.*, No. 04-20-00493-CV, 2021 WL 1553973, at *2 (Tex. App.—San Antonio Apr. 21, 2021, no pet.) (per curiam) (mem. op.). Here, Medellin not only failed to direct us to the evidence, but he assured us in his opening brief that no such evidence existed.[1]

Putting aside Medellin's about-face, Medellin's cumulative-evidence argument on rehearing is unavailing because the test results that he now showcases are not cumulative. Only the excluded testimony would have established consumption on the morning — and perhaps until noon, according to Garcia — of the accident. The trial court effectively excluded any mention of Medellin's consumption of alcohol and marijuana on the day of the incident by sustaining Medellin's objections. Therefore, the excluded evidence was not cumulative. The rest of the

---

[1] The majority accepts Medellin's newfound cumulative-evidence argument by contending that "an appellee 'd[oes] not need to raise every argument supporting the trial court's judgment in its appellee's brief in the court of appeals.'" *See JMI Contractors, LLC v. Medellin*, No. 04-22-00072-CV, Slip Op., p.17 (Tex. App.—San Antonio Aug. 28, 2024, no pet. h.) (op. on reh'g) (quoting *In re G.X.H.*, 627 S.W.3d 288, 295 (Tex. 2021)). However, Medellin's brief on original submission did more than simply omit a responsive harm analysis; it asserted the opposite of what Medellin now contends, stating: "There was no evidence of Medellin's blood alcohol content (BAC) or toxicology levels." This inconsistency alone distinguishes this case from *In re G.X.H.* *Cf. In re G.X.H.*, 627 S.W.3d at 301 (noting that "[t]he Department's position in this Court is consistent with the position it had taken all along" and concluding that "both estoppel and the invited-error doctrine are inapplicable.").

evidence strongly favored Medellin in that there was relatively little evidence supporting JMI's proportionate-liability defense. Therefore, the "first consideration — whether the evidence was cumulative or strongly one-sided — does not support a conclusion that the exclusion was harmless." *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 840 (Tex. 2018).

The second consideration — whether the excluded evidence was crucial to a key issue — also does not support a conclusion that the exclusion was harmless. In *JBS Carriers*, the Texas Supreme Court wrote that "it is unquestionable that [the decedent's] state of mind and mental decision-making processes were crucial to the key issue of whether her decision to walk into the street met the standard of reasonable care." *Id*. In this case, Medellin's ability to maintain his orientation while completing the project he and Reybel Rodriguez undertook was a key issue in assessing whether Medellin was negligent. Raul Rodriguez's testimony that Medellin appeared dizzy and his and Hernandez's recollection that Medellin smelled of alcohol and marijuana speak to whether Medellin acted as a person of ordinary prudence under the same or similar circumstances. Even Spear acknowledged that if Medellin "felt that he was under the influence then he should have refused to perform that work."

When asked by JMI to describe how he fell off the roof, Medellin testified by deposition, "[b]ecause the man told me to pull the whole roll. And because everybody was going so fast, he said go, go, go, go. I continued walking and for — and because I was observing the man that told me, I forgot about the edge and I fell." Medellin's consumption of alcohol, marijuana, and "benzos" may have played no, some, or a significant role in Medellin accepting roofing work on the day in question and then "forg[e]t[ting] about the edge." These two acts or omissions by Medellin were key issues in JMI's proportionate-liability defense. Whatever role such consumption may have played, it was for the jury — not the trial court — to reconcile through the excluded testimony of Medellin, the test results that Medellin belatedly acknowledges, and the

testimony of Garcia, Raul Rodriguez, Hernandez, and Spear. Accordingly, the excluded evidence meets the second harmful error consideration articulated in *JBS Carriers*. *Id*.

### III. CONCLUSION

As on original submission, I would sustain JMI's sub-issue challenging the exclusion of evidence, and remand for further proceedings consistent with this opinion.[2] I would not address JMI's remaining issues because they would not afford greater relief than already provided. *See* TEX. R. APP. P. 47.1.[3] Because the majority does otherwise, I respectfully dissent.

Rebeca C. Martinez, Chief Justice

---

[2] I also would overrule JMI's legal-sufficiency sub-issues for the reasons previously stated. *See JMI Contractors, LLC v. Medellin*, No. 04-22-00072-CV, 2023 WL 4217036, at *2–6 (Tex. App.—San Antonio Jun. 28, 2023, no pet.) (mem. op.) (Martinez, C.J.).

[3] As to the remaining issues, I note only that the majority does not look to *Alonzo v. John*, 689 S.W.3d 911 (Tex. 2024) (per curiam), the Texas Supreme Court's most recently issued opinion on incurable argument.